UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL WAGNER,

      Plaintiff,

v.                                                    Case No. 22-11105

FARM BUREAU INSURANCE
COMPANY OF MICHIGAN,                Sean F. Cox
                                                          United States District Court Judge

      Defendant.

_____/

**OPINION & ORDER**
**DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      Following his termination, Plaintiff filed this action against his former employer, alleging

that he was discriminated against on the basis of age, in violation of federal and state law.

Discovery has closed and the matter is now before the Court on Defendant's Motion for

Summary Judgment.  The parties have briefed the issues and the Court heard oral argument on

July 17, 2023.   For the reasons set forth below, the Court DENIES the motion and Plaintiff's

claims shall proceed to a jury trial.

**BACKGROUND**

      Plaintiff Paul Wagner filed this action against his former employer, Farm Bureau General

Insurance Company of Michigan ("Defendant" or "Farm Bureau")[1] based upon federal-question

jurisdiction.  Plaintiff's complaint includes the following two counts: 1) "Age Discrimination in

Violation of the ADEA" (Count I); and 2) "Age Discrimination in Violation of the Elliott-Larsen

_____

[1]Plaintiff also named other entities as Defendants but they have been dismissed.

1

Civil Rights Act" (Count II).

Discovery has closed and Defendant filed a summary judgment motion. This Court's

practice guidelines provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled
> Statement of Material Facts Not in Dispute. The statement shall list in separately
> numbered paragraphs concise statements of each undisputed material fact,
> supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-
> Statement of Disputed Facts. The counter-statement shall list in separately
> numbered paragraphs following the order or the movant's statement, whether each
> of the facts asserted by the moving party is admitted or denied and shall also be
> supported by appropriate citations to the record. The Counter-Statement shall also
> include, in a separate section, a list of each issue of material fact as to which it is
> contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute
> shall be deemed admitted unless controverted in the Counter-Statement of
> Disputed Facts.

(Scheduling Order at 2-3).

Defendant complied with the Court's practice guidelines for summary judgment motions

such that its motion includes a "Statement of Material Facts Not In Dispute" ("Defs.' Stmt.")

(ECF No. 28-2) and Plaintiff included a "Counter-Statement of Disputed Facts" (Pl.'s Stmt.")

(ECF No. 32-1).

The relevant evidence submitted by the parties – *construed in the light most favorable to*

*Plaintiff* – is as follows.[2]

_____

[2]There is a good deal of conflicting testimony. For example, Dansby testified that she
alone made the decision to terminate Plaintiff, and made that decision at the end of the kick-off
meeting in January of 2021 (Dansby Dep. at 21). Smith testified that the decision to eliminate
Plaintiff's position was made in February of 2021 and was made equally by a group of three:
Smith, Dansby, and Taylor. (Smith Dep. at 138-40). Plaintiff testified that Smith told him he
made the decision to terminate him. (Pl.'s Dep. at 40). Because all evidence must be construed

Plaintiff Paul Wagner was born in 1960 and is currently 63 years old.  Plaintiff was hired by Farm Bureau in 2008 as a Business Planning Specialist.  (Def.'s & Pl.'s Stmts. at ¶ 1).  Greg Smith hired Plaintiff.  (*Id*.).

Smith is one of Farm Bureau's Statewide Sales Directors, a position he had held since 2009.  (Def.'s & Pl.'s Stmts. at ¶¶ 5-6).  As a Statewide Sales Director, Smith managed all RAMs and Managing Partners in each of Farm Bureau's regions, including the Bay Thumb, Central, Southeast, Northern, and Western regions.  Each region is managed by a partnership.  (Def.'s & Pl.'s Stmts. at ¶ 9)

In February of 2014, Plaintiff became a Regional Associate Manager ("RAM") for Farm Bureau, within its Southeast Partnership.  In the RAM role, the employee is meant to be doing everything that a Managing Partner would do.  Def.'s & Pl.'s Stmts. at ¶ 3.  Plaintiff testified that he was one of approximately fifty individuals who interviewed for the position and that he was selected for hire by Tom Parker, Chuck Knuth, and Tom Bijan.  (Pl.'s Dep. at 73).  Plaintiff again reported to Smith.  (*Id*. at 74).

**Plaintiff Successfully Works As MP In Southeast Region**

In November of 2016, Plaintiff was promoted to Managing Partner ("MP") in the Southeast region, again reporting to Smith.  (Def.'s & Pl.'s Stmts. at ¶ 10).  Smith recommended Plaintiff's promotion to that position.  (*Id*. at ¶ 11).

A Managing Partner's salary is dictated by gross profits accumulated through agent production within their region.  In the Southeast region, Plaintiff was paid a partnership share (a

_____

in the light most favorable to Plaintiff, the Court does not include here all of the conflicting testimony that has been offered by Defendant.

percentage of the total aggregate sum provided to the Southeast partnership) of approximately 14%.  (Def.'s & Pl.'s Stmts. at ¶ 12-13).

Plaintiff consistently received positive performance evaluations in the Southeast region. (ECF No. 32-3).  For example, in a written performance evaluation dated March 16, 2018, Smith rated Plaintiff as "effective," "highly effective," and meets expectations in every category and included the following narrative performance summary:

> Paul has done an excellent job since joining our field leadership team.  He gets up and goes to work every day trying to create the best possible environment for his region.  He is highly effective coaching new agents and is a voice of reason in the partnership.  *I couldn't be happier with Paul and what he brings to the SE region.*

(ECF No. 32-3 at PageID.847) (emphasis added).

**Plaintiff's Transfer To the Bay Thumb Region**

Plaintiff testified that in July of 2018, he was approached by Smith about transferring to the Bay Thumb Region as a MP and that he told Smith he did not want to do so.  (Pl.'s Dep. at 95-97).

For the two years prior to that conversation, the Bay Thumb Region had not been profitable and had not received a profitability bonus.  (Pl.'s Dep. at 94-95).  Conversely, Plaintiff's Southeast region had received profitability bonuses.  (*Id.*)  Plaintiff testified that the Thumb Bay Region was in really bad shape, culturally, and needed a lot of work.  (Pl.'s Dep. at 101). That region's MP, Danny Negin "had been investigated for sexual harassment, for anger issues," and Negin "had issues with communication with the other managing partners over there."  (*Id.*)

Consistent with Plaintiff's testimony, the record reflects that Negin had been put on a

4

written performance improvement plan ("PIP") by Smith on April 10, 2017, while Negin was the MP for the Bay Thumb Region. (*See* ECF No. 32-5). It addressed several areas of concern regarding Negin's performance and behavior. For example, it stated that "As a managing partner Danny will be expected to curtail his authoritative approach in dealing with new and veteran agents. Building a moat around the Bay-Thumb region is not a desirable strategy." It also stated that he "must refrain from making any comments that could be misinterpreted as inappropriate or in the realm of sexual harassment." (*Id.*). It also outlined required steps to stay employed with Farm Bureau, including getting counseling for "control issues, anger management, and self-focus approval seeking behavior." (*Id.*). It stated that the performance issues "must be addressed immediately and on an ongoing basis to remain as a managing partner with Farm Bureau Insurance" and that "[t]his letter and outline should be considered written warning and additional issues related to the six items aforementioned could result in termination." (*Id.*).

In September of 2018, while at an off-site leadership conference, Plaintiff heard rumors that he was going to be transferred to the Bay Thumb Region, despite his having said he did not want to go there. (Pl.'s Dep. at 97-96). Plaintiff then approached Matt Taylor, who had just been named Vice President, and asked if they could talk. (*Id.* at 98). Plaintiff testified as follows about that conversation with Taylor:

> So we sat down for breakfast and he said, "Hey, what's up?" I said, "Well, the first thing that's very important to me, I'm still hearing rumors about me going to the Bay Thumb. What's that all about?" He said, "Oh, no. It's happening." I said, "Why is it happening? I told Greg I didn't want to do this."
> He said, "Well, Danny Negin is one of my best friends, not just with Farm Bureau, but in life, and I need to take care of Danny. He has all kinds of problems up there and I think he deserves a fresh start."
> I was like, "Well, that's great for Danny, Matt, but what about me and my family? How is that reasonable to Joni and I and to my partners? How is that

reasonable?"

> He said, "Well, everybody loves you, Pauly.  The veteran agents respect you, the new agents love you."  He said, "You're going to be great wherever you go."  I said, "But I've earned that.  I've earned that reputation, Matt.  I don't understand why I have to give up something when I've done these things to earn that reputation."  He said, "Well, we're doing it."  So that was it.

(Pl.'s Dep. at 98-99).

Smith testified that Plaintiff was not transferred because he had been doing a bad job in the Southeast region.  (Smith Dep. at 50).  Smith testified that the Bay Thumb Region is a "more rural area," with a "slower pace than the southeast" region and they thought Plaintiff would be a "better fit" there.  (Smith Dep. at 50-51).

Plaintiff testified that he "wasn't happy about going over there, but once I – once it was a done deal, I put my mind to it" that, "Well, let's go over and make this the best region in the company."  (*Id.* at 101).

Plaintiff reported to Smith and Taylor, both Statewide Sales Directors.  As of October of 2019, Smith and Taylor reported to Debra Dansby, the Vice President of Marketing.  (Def.'s & Pl.'s Stmts. at ¶ 15).

After transferring to the Bay Thumb Region in February of 2019, Plaintiff served as MP, along with MP Rich Garcia.  (Pl.'s Dep. at 111).  Plaintiff and Garcia then hired Alyssa Gulvas as a Regional Sales Manger.  (*Id*.)

Plaintiff told Smith that he thought it would take about five years to turn the Bay Thumb Region around and Smith did not disagree with him.  (Smith Dep. at 167-69).

Annually, each region holds a kickoff meeting for that region's agents.  (Def.'s & Pl.'s Stmts. at ¶ 91).  This is a very important meeting, where Managing Partners for the region run the

meeting and various superiors (including supervisors such as Dansby) attend the meeting.  (*Id.* at

¶ 92).  The MPs in the region plan the meeting.  (Garcia Dep. at 99; Pl.'s Dep. at 177).  Plaintiff

agrees that if a MP was not at a kickoff meeting, he or she better have a "pretty darn good

reason" for missing it.  (Pl.'s Dep. at 178).

The Bay Thumb Region had its 2020 kick off meeting on January of 2020.  It was an in-

person meeting in Frankenmuth, Michigan.  (Dansby Dep. at 23).  Dansby testified that kickoff

event "had no energy.  The team was not organized in their delivery.  There were errors on slides.

It was not well done."  (Dansby Dep. at 23).  Dansby testified that "[y]ou have to do things in the

environment to create energy like play music and be excited.  None of that was present."  (*Id*. at

85).  Dansby testified that she did not discuss any of those concerns with Plaintiff.  (Dansby Dep.

at 24).

In February of 2020, Plaintiff received his 2019 performance evaluation, conducted by

Smith.  This was Plaintiff's first evaluation in the Bay Thumb Region.  (Def.'s & Pl.'s Stmts. at ¶

58).  Plaintiff testified that Smith gave Plaintiff his performance review in February of 2020 and

verbally told Plaintiff he was doing a "great job," how much he appreciated his going to the Bay

Thumb Region, and that "[e]verything was positive."  (Pl.'s Dep. at 129-30).  Plaintiff's written

evaluation by Smith rated Plaintiff as "effective" in every category. Smith did not rate Plaintiff as

"less than effective" in any category.  Smith also included a number of positive narrative

statements about Plaintiff, including: "Paul is well respected and liked throughout the

organization;" "Paul is predictable and consistent.  He expects others to be as well.   He wants

their best effort and holds them to giving that best effort;" "Paul is a level headed person" and

"is a team player;" and "Paul is a good thinker and understands business.  He is always looking

for solutions and has a good mind for details."  (ECF No. 32-2 at PageID.853-54).

Plaintiff testified that in December of 2020, he called a meeting with Smith and Taylor to review several issues.   One of those issues Plaintiff wanted to discuss was rumors he was hearing about his own retirement.  Plaintiff testified as follows as to that conversation:

Q.     Got it.  Thank you.
             Did Greg or Matt or Rich discuss concerns they had with your lack of engagement at that meeting?
A.     No.
Q.     You don't recall that?
A.     There was none. I actually asked them when they brought up my age and that I was retiring at 62.
Q.     Say that again?
A.     I asked, I said, "Okay, here's one, here's two, here's three.  So No. 4, what is this I'm hearing rumors about me retiring?"  And I said, "I haven't talked to anybody including my wife."  And I said, "In fact, the closest I've come is coming with Rich where I've told him I'll work for sure until I'm 65 and then you and I will go year by year.  If everything is still great, still loving what we're doing, we'll go to 66, then we'll go to 67, then we'll go 68, you know, then go to 70 if that works out."
       But that's the only – as close as I come to even thinking about it.  To me, 60 – just because I turned 60, it's so arbitrary that you have to start thinking about retirement. It was just arbitrary.  I would out every day, I keep myself fit.
       So I said, "What is this, the rumors I'm hearing about I'm retiring?  Since I haven't brought it up and the closest thing is talking to you Rich, that leads me to believe it's either you, Greg, or you, Matt, or both of you are bringing this up that I'm retiring."
       Greg said, "Well, Pauly, you're going to be – not 2021." I said 2021; that's what Rich had told me.  He said, "Not 2021.  2022, you're going to be 62, you'll be fully vested in the pension, we'll get you a three-year buyout.  Tom Parker is going to be going out the same time.  I'm going to be leaving about the same time.  I'm going to be leaving about the same time.  The three of us can go out together.  Matt, do you have anything you would like to add?"
       Well, that led me to believe that they were talking about it.  And Matt said, "Well, I don't even know how old you are, but we ask agents to give us a year notice if they're going to retire so we have an opportunity to sell the business or make arrangements and we would ask the same thing from an MP, that you give us a year notice."
       I said, "Okay.  Fair enough." I said, "I want you guys to know, I have no intentions of retiring in the next couple years.  I have a problem if you guys are

8

trying to get rid of me and using age as a reason." And I said, "I think the – I said, "The EEOC would and I hope our human resources department would too. If you guys have any concerns about my performance, I would like you to address that with me now."

"No, you're all good, Paul. You're all good."

Okay. So we moved on to Item No. 5.

(Pl.'s Dep. at 214-17). Plaintiff was not actually pension eligible and Smith was mistaken when he told him otherwise. (Pl.'s Dep. at 220-21; Smith's Dep. at 142).

Although the annual kickoff meetings were usually held in person, in January of 2021, the kickoff meeting for the Bay Thumb Region was held virtually, via a Teams platform. That was due to the COVID-19 pandemic. (Pl.'s Dep. at 179). Garcia attended the virtual kickoff meeting from the office, while Plaintiff attended from Florida, and Gulvas attended from her home. (*Id*).

Plaintiff testified that he was on vacation on that date and that Smith had approved his vacation. (Pl.'s Dep. at 179). He also testified that he discussed appearing for the meeting from his vacation in Florida and Garcia and Gulvas said they were good with that. (*Id*. at 182-83). Plaintiff participated in the 2021 kickoff meeting and fully participated. (Pl.'s Dep. at 184-85 & 187). Plaintiff participated in the virtual meeting from the living room of his rental property "with the shades closed." (*Id*. at 247).

**Plaintiff Is Told His Position Is Being Eliminated Because The Bay Thumb Region Was Being Eliminated**

In March of 2021, Plaintiff was scheduled to meet with Smith for Plaintiff's annual performance review. (Pl.'s Dep. at 263). That meeting was via a Teams call. After exchanging pleasantries, Smith told Plaintiff they were eliminating the Bay Thumb Region and his position:

Q.    Tell me about that meeting.

A.    It was supposed to be my performance review and he said - he and I traded pleasantries. . .  We got on the Teams call and he goes, "Paul, I'm going to

get right to it.  We're eliminating the Bay Thumb, and with that, we're eliminating your position."

(Pl.'s Dep. at 263).   Plaintiff testified as follows when he was told the Bay Thumb region was being eliminated:

> And I said, "Wait, wait. What are you talking about, Greg?"  And he goes, "Well, I'm not here to talk to you about that right now."  And I said, "Yeah, Greg, we need to talk about that."
> And I said, "You know, I do you guys a favor and now you're eliminating my position?  What's going on with Rich and Alyssa?"  He said, "No, we're keeping Rich and Alyssa."
> I said, "Wait, I'm being fired and you're keeping Rich and Alyssa?"  And he said, "Yeah, but we're not going to talk about that right now. You get a three-year buyout, you'll get your extended earnings and I really just wanted to let you know what was going on and we'll talk about the reasons at some future date."

(Pl.'s Dep. at 263-64).  Plaintiff left that meeting with Smith with the understanding that he would remain employed in his position as MP of the Bay Thumb region until February 1, 2022.

(Pl.'s Dep. at 272; Smith's Dep. at 140).

**Smith's Stated Reasons For Eliminating Plaintiff's Position**

In April of 2021, Smith and Taylor invited Plaintiff to lunch.  (Pl.'s Dep. at 239-40).

Plaintiff testified that Smith said, "I know there's a lot bothering you and you don't think this is right.  Would you like to talk about it?" and Plaintiff said that he did not.  After Smith continued to press the issue several times, Plaintiff said ok, let's talk about it. Then, for the first time, Smith verbally gave Plaintiff a number of performance-based reasons why his position was being eliminated.

First, Smith noted that Plaintiff had not attended a dinner in Boston with other MPs back in September of 2020, while a group of employees were in the city for training.  (Pl.'s Dep. at 241-47).  Plaintiff testified that training was a voluntary event and that, on the night in question,

10

he had dinner alone with his wife because it was their anniversary.  (*Id*.)

Smith then told Plaintiff that "Southwest was having problems" before Plaintiff left that

region.  (*Id*. at 244).  But Plaintiff had not been told about any such problems in the Southwest

region.  (*Id*. at 244-45).

Smith then told Plaintiff that Dansby did not like their kickoff in 2021, and said it was a

"bad look" for Plaintiff to be seen with "palm trees in the background" while other employees

had not been out of their houses in two years.  (*Id*. at 247).

When Taylor expressed that recruiting had been down in the Bay Thumb Region, Plaintiff

responded, "Matt, that's not true.  Bay Thumb just had a record-breaking year for recruits.  We

did nine.  There's never even been close to that in the Bay Thumb" and Plaintiff actually had

supporting documents with him.  (Pl.'s Dep. at 248).

Plaintiff testified that Smith told him that Smith made the decision to terminate him.

(Pl.'s Dep. at 40; Pl.'s Stmt. at ¶ 107).

Plaintiff testified that, after hearing these criticisms of his performance for the first time,

Plaintiff asked Taylor why none of this had ever been raised with him before:

> Q.   So tell me more about that.
> A.   So I looked at Matt and said, "Matt, you brought up three or four things
>      that are concerns to you, and I don't necessarily agree with them, but why"
>      – said, "In the two years that you've been VP of marketing, director of
>      sales for the state of Michigan, you and I have never sat down with any of
>      your concerns about what I'm doing.  Why all the sudden now after my
>      position is eliminated new you are bringing these to my attention?"
>      And Greg had his portfolio and he slammed it and said, "I'm ending this.
> You're setting my partner up."  And I said, "Greg, how am I setting your partner
> up?  I just want to know.  This is pretty serious stuff . . . I don't think any of these
> things are fireable offenses, but even so, if you guys are willing to fire me, it
> seems like someone would have talked to me about this before today."  And I
> said, "I'm not setting Matt up."  I said, "Matt, I'm sorry if you feel like I'm setting

you up.  I don't mean to be doing that.  I'm actually trying to figure things out.
None of this makes sense to me."

(Pl.'s Dep. at 255-56).

Soon after that meeting, Plaintiff observed that Garcia and Gulvas had been spending

their time outside of the Bay Thumb region, in the Central region, and asked them about it.

Plaintiff testified that Garcia said "Paul, you don't know what they're telling us.  They're telling

us to do something different than you're telling us."  (Pl.'s Dep. at 227).  Plaintiff then contacted

Smith, and let him know that his partners in the Bay Thumb region did not appear to be on the

same page and requested a meeting for all to discuss the plan going forward.  (Pl.'s Dep. at 228-

29).  Smith responded that a group meeting would be a good idea and that his administrative

assistant would set one up.

Shortly thereafter, however, Plaintiff received a meeting invitation with Smith and

Taylor, without Garcia and Gulvas included.  (Pl.'s Dep. at 229). It was an in-person meeting, in

Port Huron, that lasted five minutes.  At that May 24, 2021 meeting, Plaintiff was told that his

position as MP of the Bay Thumb region was terminated effective that day.  (Pl.'s Dep. at 230-

31).  Plaintiff was offered a separation agreement, was told he had 30 days to sign it, and was

reminded of his non-compete obligations.  (*Id*.).

## STANDARD OF DECISION

Summary judgment will be granted where there exists no genuine issue of material fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuine issue of material fact

exists where "the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party."  *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986).  In reviewing Defendant's summary judgment motion, this Court must view all facts and inferences in the light most favorable to Plaintiff, the nonmoving party.  *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).

## ANALYSIS

Plaintiff brings his age discrimination claims under the federal Age Discrimination in Employment Act ("ADEA") and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA").  Under the ADEA, an employer is prohibited from discharging older employees on the basis of their age. 29 U.S.C. § 623(a).  The same is true under Michigan's ELCRA.  Mich. Comp. Laws § 37.2202 *et seq.*  As the parties recognize, the same general standards and analysis applies to both of these claims.  (*See* Def.'s Br. at 4; Pl.'s Br. at 10; *Geiger v. Tower Auto*., 579 F.3d 614, 626 (6th Cir. 2009)).

At the summary judgment stage, Plaintiff can support his age discrimination claims using either direct or indirect evidence of age discrimination.  *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 570 (6th Cir. 2003); *Wiliard v. Huntington Ford, Inc.*, 952 F.3d 795, 806 (6th Cir. 2020).

## I.    Direct Evidence

Direct evidence is evidence that proves the existence of a fact without requiring any inferences.  *Wiliard,* 952 F.3d at 806.  (Citations omitted).  "Such evidence 'requires the conclusion that age was the 'but-for' cause of the employment decision.' *Scheick v. Tecumseh Pub. Schs*., 766 F.3d 523, 530 (6th Cir. 2014) (clarifying the inquiry post-*Gross*)."  *Id*.  In other words, direct evidence must include both a predisposition to discriminate and that the employer acted on that predisposition.  *Id.*

13

Defendant's motion anticipated that Plaintiff might attempt to survive summary judgment based on direct evidence. But Plaintiff did not do so. Plaintiff's response argues that he can survive summary judgment under the circumstantial evidence approach.

## II.   Circumstantial Evidence Approach

When a plaintiff relies on indirect evidence to show age discrimination, the familiar *McDonnell Douglas* burden-shifting framework applies.   Under that framework:  1) a plaintiff must first establish a prima facie case of discrimination; then 2) the burden of production shifts to the defendant to show a legitimate, nondiscriminatory reason for the way it treated the plaintiff; and 3) if the defendant does so, the burden of production shifts back to the plaintiff to show that the defendant's articulated reason was pretext for the adverse employment action. *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019).

The Sixth Circuit has instructed that courts should be "cautious in granting, and affirming, summary judgment on discrimination claims when the plaintiff has made a prima facie case and a showing of pretext because 'an employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determination unsuitable for disposition at the summary judgment stage.'" *Williard*, 952 F.3d at 811 (quoting *Singfield Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004)).

### A.   Prima Facie Case

A plaintiff establishes a prima facie case of age discrimination by showing that: 1) he is a member of a protected group; 2) he was qualified for the position in question; 3) his employer took an adverse employment action against him; and 4) there are circumstances that support an inference of discrimination.  *Williard,* 952 F.3d at 808.  "The plaintiff's burden to establish a

14

prima facie case is light, one 'easily met' and 'not onerous.'" *Id.* (citations omitted).

Here, Defendant concedes that Plaintiff is a member of a protected group and that he suffered an adverse action because he was terminated. Defendant also does not challenge the second element. (*See* Def.'s Br., that "assum[es] he can show he was minimally qualified for his job.").[3] Thus, the only element challenged by Defendant is the fourth element.

Again, the fourth element is that there are circumstances that support an inference of discrimination. That element can be established by, among other things, showing that the employer replaced the plaintiff with a younger employee or by showing that the employer treated similarly situated, non-protected employees more favorably. *Williard, supra.*

Here, Plaintiff has put forth sufficient evidence to establish the final element of a prima facie case. While Plaintiff was not replaced by a younger worker, viewing the evidence in the light most favorable to Plaintiff, there are circumstances that, considered collectively, support an inference of age discrimination.

As Plaintiff's brief stresses, Defendant transferred Plaintiff to the Bay Thumb Region despite his having stated that he did not wish to transfer there. That region was known to have had problems, and the MP prior to Plaintiff being transferred there had been placed on a PIP for performance issues. After Plaintiff was transferred there, he continued to receive satisfactory reviews. In December of 2020, Plaintiff had a meeting with Smith and Taylor to address rumors about him retiring, and Smith made statements that could be construed as telling Plaintiff to retire in 2022. But Plaintiff advised Smith and Taylor that he had no intention of retiring and had

---

[3]And even if Defendant had challenged this element, that challenge would fail based on the record before the Court

them confirm that there was no issues with his performance.  A few months later, Plaintiff was told by Smith that they were eliminating his region and his position, and that his employment would end in 2002 – the same year that Smith had wanted Plaintiff to retire.  Then a month later, Smith and Taylor gave Plaintiff a list of performance-based reasons why his position was being eliminated – although they had not documented any of those concerns in his personnel file.  And perhaps most importantly, Smith never took any remedial measures with Plaintiff prior to his termination, but Smith did so with the prior, and younger, MP for the Bay Thumb Region (Negin).

In its reply brief, Defendant notes that Plaintiff argues that he was not given an opportunity to improve his performance prior to his termination, as was afforded to a younger employee, Negin.  Defendant argues that Negin is not similarly-situated to Plaintiff because Dansby was not a Vice President at Farm Bureau at the time that Negin was put a on PIP.  (Def.'s Reply Br. at 3-4).

The Court rejects that argument.  In order to meet his burden as to this final element, Plaintiff need only demonstrate that a comparable non-protected person was treated better. *Louzon v. Ford Motor Co.*, 718 F.3d 556, 563 (6th Cir. 2013).  It is undisputed that Negin was employed in the *very same position* as Plaintiff when Negin was afforded the opportunity of a PIP – MP of the Bay Thumb Region.  And both Plaintiff and Negin reported to Smith.  Thus, Plaintiff has provided sufficient evidence to meet his burden of showing that Negin was treated better.  To rule otherwise, simply because Vice President Dansby was not at Farm Bureau when Negin was placed on his PIP by Smith, would be to apply the similarly-situated requirement far too narrowly. *Louzon, supra.*

16

Accordingly, the Court finds that Plaintiff has met his relatively light burden of establishing a prima facie case of age discrimination.

**B.      Defendant's Asserted Legitimate, Nondiscriminatory Reason For Plaintiff's Termination**

Once Plaintiff establishes a prima facie case, the burden of production shifts to Defendant to show a legitimate, nondiscriminatory reason for Plaintiff's termination.

Defendant Farm Bureau proffers, as its proffered legitimate, non-discriminatory reason for Plaintiff's termination, Plaintiff's "persistent performance problems and utter lack of engagement." (Def.'s Br. at 14).  Defendant goes so far as to claim that Plaintiff was failing "in essential job-related duties." (*Id*. at 15).

**C.      Pretext**

Next, the burden of production shifts back to the plaintiff to show that Defendant's articulated reason was pretext for Plaintiff's termination.

A plaintiff can refute the legitimate, nondiscriminatory reason that a defendant offers to justify an adverse action by showing that the proffered reason:  1) had no basis in fact; 2) did not actually motivate the defendant's challenged conduct; or 3) was insufficient to warrant the challenged conduct. *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003).  The first type of showing consists of evidence that the proffered bases for the termination never happened (*i.e.,* that they are factually false). With respect to the second kind of showing, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  The third showing consists

17

of evidence that other employees, particularly those not in the protected class, were not fired even though they engaged in similar conduct. *Id*.

But, as explained by the Sixth Circuit, the parties need not follow those "categories rigidly. The categories simply provided a 'convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer [take the employment action] for the stated reason or not?.'" *Brown*, 814 F. App'x at 80 (citations omitted). Ultimately, the plaintiff must produce sufficient evidence from which a jury could reasonably reject the employer's explanation of why it fired Plaintiff. *Id*. Thus, a plaintiff remains free to pursue arguments outside of these categories but must "articulate some cognizable explanation" of how the evidence he has put forth establishes pretext. *Miles v. South Central Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020).

Here, Plaintiff articulates a pretext argument that is somewhat outside of the traditional categories, based on the collective evidence and timing of events here:

> Courts reviewing age discrimination claims on summary judgment recognize that "code words" can be used to mask a discriminatory intent. For example, in *Taggert, supra*, the description of the plaintiff as "overqualified" was accepted as evidence of discrimination where it was used to deny employment to an older applicant. *See also EEOC v DC, Dep't of Human Servs,* 729 F.Supp. 907, 915 (1990) (recognizing "over qualified" and "over specialized" as "buzzword[s] for 'too old'"). Similarly, describing an employee as being more suited to work in a certain area because it is slower can be viewed as evidence of age-based discrimination.
>
> Again, it is not Wagner's claim that his transfer to the Thumb Region was in and of itself discriminatory – rather, it was part of an entire scheme to get rid of him as he approached what Defendants apparently believe should be a mandatory retirement age of 62. Despite the numerous complaints and written corrective action plans about Negin's performance, Defendants engaged in a concerted effort to save his job. Defendants' treatment of Negin's performance issues – including direct counseling on personnel issues and a written performance improvement plan – was admittedly not afforded Wagner. Instead, because Defendants

18

intended Wagner to retire at age 62, they didn't undertake any remedial steps with him whatsoever.

And when putting Wagner "out to pasture" in the "slower" rural Bay Thumb Region didn't result in the voluntary retirement Defendants had intended, his job was eliminated.  The timing cannot be understated.  It was not until December of 2020 that Smith told Wagner that he was expecting him to be retiring in early 2022.  (Wagner, 226).  When Wagner objected, one month later his job was eliminated, but he was told he would remain employed until – interestingly enough – February 2022.  He was then terminated after Defendant took some time to organize a story to "justify" a termination.

(Pl.'s Br. at 14-15).

In addition to this, Plaintiff also directs the Court to pretext evidence of the traditional variety.

One traditional category is showing that an employer's stated reasons "have no basis in fact."  Smith told Plaintiff that he made the decision to terminate him.  Smith told Plaintiff that he was being terminated because the Southeast region had been "having problems" before Plaintiff left that region for the Bay Thumb region.  Plaintiff directs the Court to Plaintiff's testimony that he was never told about any problems while he was in that region and also directs the Court to the written performance evaluations he received while he was in the Southeast region – that were positive. Indeed, in Plaintiff's last written performance evaluation in that region, Smith included a narrative performance summary that closed by saying "*I couldn't be happier with Paul and what he brings to the SE region.*"  (ECF No. 32-3).

At the lunch meeting wherein he was provided with performance-based criticisms, Plaintiff was also told that recruiting had been down in the Bay Thumb region under his tenure. But Plaintiff responded that was not true, explained that his region had a "record-breaking year for recruits" and had supporting data with him to support that.  (Pl.'s Dep. at 248).

19

Plaintiff was also told that it was a "bad look" for Plaintiff to be seen with "palm trees in the background" during the 2021 kick-off Teams meeting.  (Pl.'s Dep. 247).  Plaintiff testified, however, that he participated in that virtual meeting from the living room of his rental property "with the shades closed."

With all of this evidence in his corner, Plaintiff creates a dispute as to whether those reasons lack a basis in fact.  *Zarza v. Board of Regents of Univ. of Michigan*, 2023 WL 3270899 at *5 (6th Cir. 2023).

Other record evidence also undermines Defendant's claimed rationale for terminating Plaintiff.  Defendant contends that Plaintiff was "failing in essential job-related duties."  (Pl.'s Br. at 15).  But look at his employment record.  Plaintiff began working for Defendant in 2008 and Defendant has not provided the Court with any discipline notices, negative reviews, counseling notices, or performance improvement plans.  To the contrary, the evidence before the Court reflects positive performance evaluations of Plaintiff.  In other words, Defendant terminated a long-term employee for alleged performance-based reasons – but did not document those alleged performance concerns in his employment file.  And Plaintiff testified that none of these alleged performance-based concerns were ever raised with him verbally before he was told he was being terminated.  *See, eg.*, *Zarza, supra* at *5 ("Other realities undermine the University's claimed rationale. Look at Zarza's record.  She worked for the University for 14 years without 'documented discipline.'"); *Yazdian v. ConMed Endo. Tech., Inc.*, 793 F.3d 634, 653 (6th Cir. 2015) (Jury could conclude employee's termination was not warranted where he consistently performed well and had mostly positive evaluations); *Cady v. Remington Arms Co.*, 665 F. App'x 413, 420 (6th Cir. 2016) (A fact finder could determine that the plaintiff's

performance issues "didn't warrant firing" where he had mostly good performance reviews and there was no indication he was counseled about his performance).

Defendant's claimed rational for terminating Plaintiff is also undermined by Smith having placed the prior (and younger) MP of the Bay Thumb region on a PIP to give him an opportunity to correct his performance concerns but not extending any such opportunity to Plaintiff, despite his being a long-term (13 year) employee of Farm Bureau.

In addition, as a matter of commonsense, a company that is terminating an employee for poor performance (eg, an employee who is failing in his essential job-related duties),  does not usually offer that employee a "three-year buyout."[4]  (*See* Pl.'s Dep. at 263-64) (testifying that Smith told him that although his position was being eliminated he would get a three-year buyout).

Viewing all of the record evidence in the light most favorable to Plaintiff, a jury could reasonably reject Farm Bureau's proffered reasons for terminating him and could determine that his age was the but-for cause of his termination.

## CONCLUSION & ORDER

Accordingly, the Court ORDERS that Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  July 25, 2023

---

[4]Smith also referenced Plaintiff getting a "three-year buyout" during the retirement conversation he had with Plaintiff in December of 2020.  (Pl.'s Dep. at 214-17).